IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs January 23, 2007

## STATE OF TENNESSEE v. PAULINE LACEY

**Appeal from the Criminal Court for Davidson County**
**No. 2005-C-2157     Steve Dozier, Judge**

_____

**No. M2006-00284-CCA-R3-CD - Filed April 11, 2007**

_____

The Defendant, Pauline Lacey, appeals from the sentencing decision of the Davidson County Criminal Court. The Defendant was indicted for four counts of aggravated assault, and she subsequently pled guilty as charged. Pursuant to the terms of the negotiated plea agreement, the Defendant received an effective four-year and six-month sentence, and the trial court was to determine the manner of service. Following a sentencing hearing, the trial court ordered the Defendant to serve sixty days in jail, followed by probation for the remainder of her sentence. On appeal, the Defendant argues that the trial court erred in denying her request for full probation. Finding no error, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which THOMAS T. WOODALL and ROBERT W. WEDEMEYER, JJ., joined.

Richard McGee, Nashville, Tennessee, for the appellant, Pauline Lacey.

Robert E. Cooper, Jr., Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Amy Eisenbeck, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**Factual Background**

On August 29, 2005, the Defendant was indicted for four counts of aggravated assault with a deadly weapon, Class C felonies. See Tenn. Code Ann. § 39-13-102. The Defendant pled guilty as charged on December 8, 2005. At the guilty plea hearing, the State recounted the following facts supporting the Defendant's convictions for aggravated assault:

[T]he State's proof would have shown that this offense occurred on April 2nd, 2005, in Rivergate Mall. There were four victims in this case. Marlarita Buford, Marlow Ladd, Danielle Renwick and Princess Ladd. Marlow Ladd had killed the defendant's son approximately three years before this incident occurred. And on April 2nd, 2005, Marlarita Buford was in the mall with her family, the other victims, when one of her nephews wandered away. Danielle Renwick went searching for the nephew. The defendant approached Ms. Renwick . . . and she had the child.[1] Apparently [the Defendant] had found the child who had wandered off in the mall. When the defendant saw Buford and the other victims, including Mr. Ladd, she started an argument, pulled a gun and pointed it at the whole group including all four of the victims. She made several threats and this was all captured on videotape.

In exchange for her plea, the Defendant, a Range I, standard offender, received concurrent sentences of four years and six months for each count of aggravated assault. The manner of service was left to the discretion of the trial court.

A sentencing hearing was held on January 20, 2006. Assistant District Attorney General Jeff Burkes testified that he worked in the juvenile section of the district attorney's office and that he was involved in the prosecution of fifteen-year-old Marlow Ladd for the shooting death of DeCarto Lacey, the Defendant's sixteen-year-old son. According to Mr. Burkes, the shooting occurred in May of 2003 and Marlow Ladd was arrested in July of 2003. Mr. Burkes stated that he attempted to have the case against Marlow Ladd transferred from juvenile court to criminal court but that he was unsuccessful at the transfer hearing because there was never any proof of motive or intent.

Mr. Burkes testified that he worked very closely with the Defendant and her family during the prosecution of Marlow Ladd. According to Mr. Burkes, "one of the things" which made this case "very difficult" for the Defendant's family was that law enforcement was "never able to say . . . exactly what happened." He stated that the Defendant did not handle her frustration with the case very well. She threatened "various participants" in this case, including Mr. Burkes, and filed complaints against the detectives. Mr. Burkes testified that, at Marlow Ladd's sentencing hearing, the Defendant told the Ladd family "to go to hell" and that "she hoped . . . when they died they burned in hell . . . ." She was thereafter removed from the courtroom.

On cross-examination, Mr. Burkes stated that the "people involved" in the shooting of DeCarto Lacey initially lied about the circumstances surrounding his death, stating that DeCarto committed suicide. According to Mr. Burkes, there were only three individuals present when DeCarto was shot—DeCarto, Marlow Ladd, and Jacovey Sargent. The weapon used in the shooting was stolen and, upon questioning, Mr. Sargent implicated Marlow Ladd as the shooter. Mr. Burkes also noted that "none of these guys had any record" and that "these were all good kids . . . ."

---

[1] The Defendant disputed that she ever had physical control of the child.

Mr. Burkes stated that, although the Defendant made threats against him, he never sought an arrest warrant for her. He also testified that he recommended to the Defendant "a number of times" that she seek counseling but that she never "really took advantage" of the "victim witness coordinator."

Ms. Danielle Renwick testified that Marlow Ladd was her brother. She stated that her family had received "threatening phone calls from numerous people[,]" including the Defendant. According to Ms. Renwick, the family moved to Sumner County, the children changed schools, and the family got unlisted telephone numbers all in an effort to avoid the Defendant.

She stated that the family—Ms. Renwick, along with her two sisters and seven children—was at Rivergate Mall on April 2, 2005, to get a family portrait taken. The children ranged in age from two to fifteen years old. Ms. Renwick testified that her brother, Marlow Ladd, arrived at the mall separately to return his tuxedo. Upon locating his family, Marlow Ladd relayed that he had seen the Defendant in the food court area of the mall. They then began to "gather[] the kids up" and noticed that "little Mario" was missing.

According to Ms. Renwick, as she approached the cookie store, the Defendant walked up to her and said, "Danielle, ain't y'all looking for y'all's baby?" Ms. Renwick did not respond to the Defendant; Ms. Renwick's sister responded "yes and walked over there with her and got little Mario where he was sitting around the corner." The Defendant then said, "Can't y'all say thank you?" More harsh words ensued. During the altercation, the Defendant "pulled the gun out and it dropped to the ground." The Defendant picked up the gun and pointed it at Ms. Renwick's sister, Marlarita, who was holding one of the children. Another child was standing in front of Marlarita "crying and screaming saying no, no, no." Ms. Renwick then noticed that the Defendant's son, DeMarius, was approximately "five, six feet" away from Marlow and that the two were "having words." According to Ms. Renwick, DeMarius stated, "Momma, momma, give me the gun. Give me the gun. I'm gonna shoot." Also during the altercation, the Defendant called Ms. Renwick's name and made movements with the gun as she did so.

Security was called, and the Defendant was arrested. Ms. Renwick described the mall as "real packed that day." She stated that the people present in the food court area of the mall ran from the Defendant and hid. Ms. Renwick stated that she continued to feel threatened by the Defendant even though she had not received any threats or phone calls since the altercation at the mall.

Dana Ladd, Marlow Ladd's mother, testified that she worked at Vanderbilt Hospital and that one evening the Defendant came to visit a relative in the hospital. While the Defendant was at the hospital, she went to Dana Ladd's department and "made threats towards" her. According to Dana Ladd, the Defendant spoke with her co-workers about the case and "what was going on." Dana Ladd stated that the Defendant told her that she and her son "deserved to die because of what happened to her son." Dana Ladd testified that, after this incident, the Defendant called her at work and made threatening phone calls and that she had to be accompanied by security for two to three weeks. Dana Ladd filed a police report concerning the incident.

Dana Ladd also stated that, on another occasion, she encountered the Defendant while driving down Old Hickory Boulevard. The Defendant pulled up beside her and started "screaming and hollering." Dana Ladd was "running off the road." Dana Ladd again notified the police and filed a report.

On cross-examination, Dana Ladd acknowledged that she had not received any threats from the Defendant since April of 2005. She stated that there had been no contact between the Defendant and the Ladd family since that time.

General Burkes was recalled to the stand. He stated that Marlow Ladd pled guilty to reckless homicide in connection with the death of the Defendant's son and that, at the sentencing hearing, the State requested Marlow be placed in custody. However, the juvenile referee only ordered Marlow to serve sixty days, followed by probation. Mr. Burkes also testified that there were "cross petitions" between the families "regarding some kind of harassment with text messages." The resolution to these petitions was a mutual "stay away" order—"everybody stay away from everybody . . . ."

The Defendant testified on her own behalf. The Defendant stated that she was thirty-nine years old, that she grew up in East Nashville, and that she had five siblings. She further stated that she was single and had two sons, DeMarius and DeCarto. The Defendant also testified that, prior to the incident at the mall, she had never been arrested.

The Defendant explained that she had a difficult time dealing with the death of her son, DeCarto, stating that her "world just crumbled[,] . . . it just made [her] into somebody . . . [she] wasn't[,]" and she "refused to accept reality." The Defendant stated that she had begun seeing a therapist and taking medication for depression—Zoloft, Seraquil, and Tegretol—and that she was "getting better."

After the death of her son, the Defendant became very angry and frustrated with how law enforcement and the district attorney's office were handling the case. She stated that, prior to this time, she had no history of violence and that she did not consider herself a violent person. According to the Defendant, she began carrying a gun to protect her other son, DeMarius, and herself because DeCarto was murdered. She stated that she "was in fear."

The Defendant testified that DeMarius was in counseling and that "it's helped him out a lot." According to the Defendant, his improvement helped her improve. She stated that she no longer had "those same feelings" of anger.

The Defendant testified that she was not presently employed and explained that the doctor recommended she needed "a little time." The Defendant stated that she had "worked most of her adult life" but that she wanted to continue with her treatment before returning to work. According to the presentence report, the Defendant worked for several employers as a "caregiver" from 2002 to 2005.

On cross-examination, the Defendant acknowledged that she attended all courtroom proceedings regarding her son's death and that she was "able to hear as much as anybody else could hear about what happened on that day[.]" She stated that she did not know Marlow or the Ladds until her son's death.

The Defendant testified that she did not intentionally take a gun to the mall that day but that she "grabbed" the wrong purse. The Defendant admitted to calling the Ladds two or three times; however, she stated that she only inquired about the circumstances surrounding her son's death.

The Defendant also testified that she went to Marlow Ladd's school and posted flyers saying "that your son could be going to school with a murderer." The Defendant also explained that she did see Dana Ladd at Vanderbilt Hospital one day but that she did not engage in an argument with her.

Regarding the incident at the mall, the Defendant testified that she did not remember dropping the gun or trying to pull the trigger. She stated that she was "scared" and was trying to protect herself and her son. She further testified that she did not remember telling the detective that she "would have killed them[.]" She acknowledged that she "was angry" about her son's death but asserted that she was acting in self-defense. She could not explain why she did not tell authorities this at the time of the incident. Finally, the Defendant denied that DeMarius stated, "Give me the gun. I'll shoot them."

The Defendant admitted that she did not have a permit to carry a weapon. The Defendant also testified that she believed her son's death was a premeditated, intentional killing. She acknowledged that it was "time to move on[.]"

The Defendant also presented several character witnesses. Mary Butler, the Defendant's sister, testified that the Defendant was devastated by the loss of her son. Ms. Butler stated that the Defendant had improved since seeking treatment and had returned to church. According to Ms. Butler, DeMarius had also improved since beginning counseling and that this positively impacted the Defendant. On cross-examination, Ms. Butler acknowledged that the Defendant did not immediately seek counseling after her son's death and that she did not do so until several months after the altercation at the mall.

Audrey Totter, also the Defendant's sister, testified that she believed the Defendant was making progress since she had begun counseling and taking medication. Ms. Totter testified that the Defendant had weekly visits with her counselor.

Karen Cheatham, a friend, neighbor, and co-worker of the Defendant, stated that she had known the Defendant for four years and that the death of the Defendant's son had a "tragic impact" on the Defendant. She stated that the Defendant "lost interest in life." Ms. Cheatham also testified that the Defendant had improved since receiving counseling, that she did not consider the Defendant a violent person, and that she believed the Defendant could follow all orders from the court. She

stated that the medication had helped the Defendant "cope with reality" and that she had seen progress in the Defendant when DeMarius began receiving counseling. According to Ms. Cheatham, the Defendant had "turned the corner."

Finally, Yolanda Green, a friend and co-worker, testified on the Defendant's behalf. Ms. Green stated that she had known the Defendant for fifteen or sixteen years and that she had talked to the Defendant almost everyday since the case against Marlow Ladd concluded. She testified that she had seen a "difference" in the Defendant since the Defendant began therapy and taking medication. According to Ms. Green, the Defendant was "doing a lot better" and was capable of moving past the anger and depression caused by her son's death.

Following the conclusion of the Defendant's proof, the State called Detective Les Carlisle of the Goodlettsville Police Department to testify. He stated that, on April 2, 2005, he was working "off duty for Rivergate Mall" and that he was at the mall during the altercation between the Defendant and the Ladds. He explained that he received a call from the officer in the food court on his two way radio—the officer "was observing a female black and gave her clothing description and she had a handgun waiving it in the food court and was requesting assistance." Detective Carlisle immediately went to the food court to provide assistance and saw that the individual had a handgun. Detective Carlisle testified that he approached the Defendant from the "rear," "grabbed" her, and placed her under arrest. According to Detective Carlisle, "[t]he food court area was extremely busy. There were families, children, in the food court area. People were . . . running, screaming, yelling."

Detective Carlisle testified that he examined the gun the Defendant was carrying and that the weapon had "stove piped meaning that there was [sic] two bullets that were attempted [sic] to enter at the same time. So the action was locked back with two bullets. They tried to go in at the same time." He stated that the Defendant was extremely agitated and emotional and that she repeated several times that she was "going to kill them." Detective Carlisle also testified that he felt threatened by the Defendant's son, who was standing "a couple of feet from" him.

On cross-examination, Det. Carlisle explained that the Defendant never attempted to "break away" from him. He further stated that Defendant's son never attempted to attack him.

Three exhibits were entered into the record—the presentence report; the video surveillance tape showing the altercation between the Defendant and the Ladds; and a letter from the Defendant's son's therapist, stating that DeMarius was receiving counseling and that DeMarius had "Adjustment Disorder . . . resulting from the murder death of his brother."

At the conclusion of the sentencing hearing, the trial court ordered the Defendant to serve sixty days in jail to be followed by probation for the remainder of her sentence. The Defendant now challenges the trial court's sentencing decision, arguing that the trial court erred in not granting her full probation.

**ANALYSIS**

Before a trial court imposes a sentence upon a convicted criminal defendant, it must consider (a) the evidence adduced at the trial and the sentencing hearing; (b) the presentence report; (c) the principles of sentencing and arguments as to sentencing alternatives; (d) the nature and characteristics of the criminal conduct involved; (e) evidence and information offered by the parties on the enhancement and mitigating factors set forth in Tennessee Code Annotated sections 40-35-113 and 40-35-114; and (f) any statement the defendant wishes to make in the defendant's own behalf about sentencing. See Tenn. Code Ann. § 40-35-210(b) (2003);[2] State v. Imfeld, 70 S.W.3d 698, 704 (Tenn. 2002). To facilitate appellate review, the trial court is required to place on the record its reasons for imposing the specific sentence, including the identification of the mitigating and enhancement factors found, the specific facts supporting each enhancement factor found, and the method by which the mitigating and enhancement factors have been evaluated and balanced in determining the sentence. See State v. Samuels, 44 S.W.3d 489, 492 (Tenn. 2001).

Upon a challenge to the sentence imposed, this Court has a duty to conduct a de novo review of the sentence with a presumption that the determinations made by the trial court are correct. See Tenn. Code Ann. § 40-35-401(d) (2003). However, this presumption "is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances." State v. Ashby, 823 S.W.2d 166, 169 (Tenn. 1991). If our review reflects that the trial court followed the statutory sentencing procedure, that the court imposed a lawful sentence after having given due consideration and proper weight to the factors and principles set out under the sentencing law, and that the trial court's findings of fact are adequately supported by the record, then the presumption is applicable, and we may not modify the sentence even if we would have preferred a different result. See State v. Fletcher, 805 S.W. 2d 785, 789 (Tenn. Crim. App. 1991). We will uphold the sentence imposed by the trial court if (1) the sentence complies with the purposes and principles of the 1989 Sentencing Act and (2) the trial court's findings are adequately supported by the record. See State v. Arnett, 49 S.W.3d 250, 257 (Tenn. 2001). The burden of showing that a sentence is improper is upon the appealing party. See Tenn. Code Ann. § 40-35-401, Sentencing Commission Comments; Arnett, 49 S.W.3d at 257.

A defendant who does not possess a criminal history showing a clear disregard for society's laws and morals, who has not failed past rehabilitation efforts, and who "is an especially mitigated or standard offender convicted of a Class C, D, or E felony is presumed to be a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6) (2003); see also State v. Fields, 40 S.W.3d 435, 440 (Tenn. 2001). The following

---

[2] We note that the legislature has recently amended several provisions of the Criminal Sentencing Reform Act of 1989, said changes becoming effective June 7, 2005. However, the Defendant's crime in this case occurred prior to June 7, 2005, and the Defendant did not elect to be sentenced under the provisions of the Act by executing a waiver of her ex post facto protections. See 2005 Tenn. Pub. Acts ch. 353 § 18. Therefore, this case is not affected by the 2005 amendments, and the statutes cited in this opinion are those that were in effect at the time the instant crimes were committed.

considerations provide guidance regarding what constitutes "evidence to the contrary" that would rebut the presumption of alternative sentencing:

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant . . . .

Tenn. Code Ann. § 40-35-103(1) (2003); see also State v. Hooper, 29 S.W.3d 1, 5 (Tenn. 2000).

Additionally, the principles of sentencing reflect that the sentence should be no greater than that deserved for the offense committed and should be the least severe measure necessary to achieve the purposes for which the sentence is imposed. See Tenn. Code Ann. § 40-35-103(2), (4). The court should also consider the defendant's potential for rehabilitation or treatment in determining the appropriate sentence. See id. at (5).

Because the Defendant was convicted of Class C felonies, she is entitled to the presumption that she is a favorable candidate for alternative sentencing. See id. § -102(6). We note, however, that "the determination of whether the Appellant is entitled to an alternative sentence and whether the Appellant is entitled to full probation are different inquiries." State v. Boggs, 932 S.W.2d 467, 477 (Tenn. Crim. App. 1996). Where a defendant is entitled to the statutory presumption of alternative sentencing, the State has the burden of overcoming the presumption of evidence to the contrary. State v. Bingham, 910 S.W.2d 448, 455 (Tenn. Crim. App. 1995), overruled on other grounds by Hooper, 29 S.W.3d at 9. Conversely, the defendant has the burden of establishing his or her suitability for full probation, even if the defendant is entitled to the statutory presumption of alternative sentencing. Id.; see Boggs, 932 S.W.2d at 477.

The Defendant is eligible for probation because her actual sentence was less than eight years and the offense for which she was sentenced is not specifically excluded by statute. See Tenn. Code. Ann. § 40-35-303(a) (2003). The trial court shall automatically consider probation as a sentencing alternative for eligible defendants; however, the defendant bears the burden of proving his or her suitability for probation. See id. at (b). No criminal defendant is automatically entitled to probation as a matter of law. See id., Sentencing Commission Comments; State v. Davis, 940 S.W.2d 558, 559 (Tenn. 1997). Rather, the defendant must demonstrate that probation would serve the ends of justice and the best interests of both the public and the defendant. See State v. Souder, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002).

In determining whether to grant probation, the court must consider the nature and circumstances of the offense; the defendant's criminal record; his or her background and social history; his or her present condition, both physical and mental; the deterrent effect on the defendant; and the defendant's potential for rehabilitation or treatment. See id. If the court determines that a period of probation is appropriate, it shall sentence the defendant to a specific sentence but then suspend that sentence and place the defendant on supervised or unsupervised probation either immediately or after the service of a period of confinement. See Tenn. Code Ann. §§ 40-35-303(c), -306(a).

Here, the trial court determined that full probation would depreciate the seriousness of the Defendant's actions by reducing the severity of the crimes committed.[3] To deny probation or another alternative sentence based on the seriousness of the offense, "the circumstances of the offense as committed must be especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of an excessive or exaggerated degree," and the nature of the offense must outweigh all factors favoring an alternative sentence. State v. Hartley, 818 S.W.2d 370, 375 (Tenn. Crim. App. 1991); see also State v. Blackhurst, 70 S.W.3d 88, 98 (Tenn. Crim. App. 2001). In addressing the seriousness of the offense, the trial court stated as follows:

> It wasn't just the Ladds that were out there and their two year olds and 5 year olds and whatever, 15 year olds. It was everybody else from Davidson County that chose just to go shopping that day and didn't know you would be brandishing a weapon and risking their lives. It's apparent from watching that tape had not the gun jammed and you had abandoned God maybe. . . . I don't know what made the gun jam. But you more than likely would be—[trial counsel] would be trying to get you out of several life sentences rather than a four and a half year sentence. I mean guns led you to losing your son. A gun led you to be here today. Had you not had the gun you'd probably run your mouth a little bit and then left on out the exit. But you wanted to show them that you mean business and you're going to carry out some of these verbal statements you've made before so you pulled it out, but it just happens to jam thankfully.

The Defendant entered a crowded shopping mall with a loaded gun and, once she encountered the child, she insisted upon confronting the Ladds. She attempted to fire shots at the victims, endangering the lives of all who were present. At one point during the altercation, the Defendant dropped the weapon to the ground. Following the event, the Defendant stated to Det. Carlisle that she "would have killed them."

The trial court also noted that, although the Defendant did not have a criminal record, she did have a previous history of criminal behavior. See Tenn. Code Ann. § 40-35-114(2) (2003); see also

---

[3] The trial court also insinuated that there was a "need" to deter others from committing a similar act. However, there is no proof in the record of a need for deterrence in the community, and it is clear from the record that the trial court based its decision on the seriousness of the offense.

State v. Zeolia, 928 S.W.2d 457, 461 (Tenn. Crim. App. 1996) (permitting use of enhancing and mitigating factors as relevant to Tennessee Code Annotated section 40-35-103(1) considerations). The trial court referenced the previous threats the Defendant had made against the Ladds and stated, "I do find that those occurred in terms of the car incident and the verbal threats and the hospital and things of that nature."

The trial court also found that the Defendant had no hesitation about committing a crime when the risk to human life was high. See Tenn. Code Ann. § 40-35-114(11). Where a defendant's actions pose a high risk to the life of a person other than the named victim, this factor may be applied to a conviction for aggravated assault. Imfeld, 70 S.W.3d at 707. The trial court noted that the incident occurred in Rivergate Mall and that "[t]here were others present in that particular food court." Danielle Renwick described the mall as "real packed that day." Detective Carlisle testified that "[t]he food court area was extremely busy. There were families, children, in the food court area. People were . . . running, screaming, yelling." The Defendant attempted to fire the weapon, but it "stove piped."

In addressing the Defendant's potential for rehabilitation, the trial court stated to the Defendant, "I do think you have potential for rehabilitation if you let this go." However, the trial court also noted that the Defendant waited five months after the altercation at Rivergate Mall to seek counseling.

We agree with the trial court that the Defendant's actions in assaulting the victims were especially violent, horrifying, shocking, reprehensible, and offensive so as to support a denial of full probation. The sentence is likewise reasonably related to the seriousness of the offenses. Furthermore, we conclude that the sentence imposed is no greater than that deserved for the offense committed and is the least severe measure necessary to achieve the purposes for which the sentence is imposed. The record supports the trial court's decision. See also State v. Robert Chapman, No. 02C01-9510-CR-00304, 1997 WL 11280, at *4 (Tenn. Crim. App., Jackson, Jan. 15, 1997) (finding consecutive sentencing proper where defendant entered a crowded shopping mall and shot the victim).

## CONCLUSION

Based upon the foregoing reasons, we conclude that the trial court did not err in ordering the Defendant to serve sixty days in jail. Accordingly, the sentencing decision of the Davidson County Criminal Court is affirmed.

_____
DAVID H. WELLES, JUDGE

-10-